PHELPS, Respondent, *v.* UNION CENTRAL LIFE INSURANCE CO., Appellant.

(No. 7,683.)

(Submitted May 24, 1937. Decided July 8, 1937.)

[71 Pac. (2d) 887.]

*Mr. Merle C. Groene,* for Appellant, submitted a brief, and argued the cause orally.

*Mr. Wm. M. Blackford* and *Mr. C. E. Baker,* for Respondent, submitted a brief; *Mr. Baker* argued the cause orally.

Opinion: PER CURIAM.

The plaintiff commenced this action to collect $1,520, with interest, for plowing alleged to have been done on lands of the defendant and at the instance of H. P. Sowter, an agent of the defendant. The defendant is the owner of some 200 farms in Montana and northern Wyoming, which were under the local supervision of H. B. Smith & Son, of Billings, Montana.

The complaint alleges the formation of a partnership between the plaintiff and his father, David V. Phelps, in the spring of 1930, for the purpose of "farming a certain tract of land, the property of the defendant, lying and being in Fergus County, Montana, known as the Triepke Tract"; that the co-partnership furnished labor, materials and machinery, and broke and rebroke lands of the defendant, at its special instance and request and at the agreed price of $4 per acre for fresh broke ground, and $2 per acre for rebreaking; that 300 acres of new ground were broken and 160 acres of rebreaking done under such arrangement; that the services alleged were of the reasonable

value of $1,520; that subsequent to July 1, 1932, the co-partnership sold and assigned the claim for such plowing to the plaintiff; and that frequent demand had been made upon the defendant for payment of the amount claimed to be due, which payment was refused. Judgment was prayed for in the amount stated, with interest from July 1, 1932, at 8 per cent. per annum.

Defendant's general demurrer was overruled. The answer is a general denial of all the material allegations of the complaint. The matter was heard by Honorable Stewart McConochie, Judge of the Tenth Judicial District, sitting with a jury. Judgment was entered July 8, 1935, in favor of the plaintiff, and on August 30 thereafter defendant's motion for a new trial was granted. December 11, 1936, the cause came on for retrial with Honorable William L. Ford, of the Fourteenth Judicial District, sitting with a jury. A verdict was again returned in favor of the plaintiff, and judgment was duly entered thereon. When the matter came on for trial defendant objected to the introduction of any evidence, which objection was overruled. When plaintiff presented his case in chief and rested, defendant moved for a nonsuit, which was denied; at the close of defendant's case it moved for a directed verdict, which was denied. Defendant then moved that David V. Phelps' testimony, wherein he stated that Sowter told him that he had authority to contract with him to do the plowing, be stricken from the record. The motion was denied. The matter is here on appeal from the judgment.

A number of errors are assigned, but we are of the opinion that the determination of the controversy depends upon whether Sowter, as the agent of the defendant, had the power to make the alleged contract for the plowing. Sowter died before this action was commenced, and the testimony of David V. Phelps as to the contract he made with Sowter is the only evidence in the record to support plaintiff's contention that such a contract was made.

The plaintiff testified that all business arrangements made and obligations incurred by the partnership were arranged by his father, and that plaintiff knew about the plowing contract only

in a general way through information coming to him from his father. Irrespective of whether Sowter ever agreed upon any such contract as David V. Phelps testified was agreed upon, the plaintiff here must show that Sowter was acting within the scope of his powers as the defendant's agent, or that the defendant is estopped to deny Sowter's authority by reason of some act of the defendant which tended to confirm by implication such authority in Sowter as Phelps alleges Sowter claimed to possess, and which was sufficient to justify Phelps in believing Sowter had the power to contract to have the plowing done.

Two very recent works of outstanding character treating at length the subject of agency we think are sufficient authority here without citing the multitude of cases found in the reports. The texts of the works referred to are supported by many authorities.

Corpus Juris Secundum, vol. 3, at page 285, subdivision 3 of section 324, lays down the following rules: "Notwithstanding broad statements in a few cases that the declarations of an agent are admissible against the principal to show the extent of the authority of the agent, it is elementary that the acts, declarations, admissions, statements, or representations of an agent are not admissible against the principal to prove the power or authority of the agent or the scope or extent thereof, unless such acts or declarations were done or made in the presence of the principal, or were within his knowledge, or were authorized or ratified by him, or there is other evidence of authority. The rule refers to declarations made by the agent out of court, off the witness-stand, or otherwise than in his sworn testimony, and it means that such declarations cannot be testified to by a third person for the purpose of proving the scope or extent of the authority of the agent. The direct testimony of an agent on the witness-stand is admissible to prove his authority and the extent thereof where his powers and duties have not been reduced to writing." Sowter's power to contract for the plowing was not shown in any one of the modes here mentioned.

To the same general effect are sections 95 and 96 of 2 American Jurisprudence, pages 76 and 77. Section 95 is in part as

follows: "A person dealing with a known agent is not authorized under any circumstances blindly to trust the agent's statements as to the extent of his powers; such person must not act negligently, but must use reasonable diligence and prudence to ascertain whether the agent acts within the scope of his powers. In other words, a person dealing with an agent assumes the risk of lack of authority in the agent. He cannot charge the principal by relying upon the agent's assumption of authority which proves to be unfounded. The principal, on the other hand, may act on the presumption that third persons dealing with his agent will not be negligent in failing to ascertain the extent of his authority as well as the existence of his agency  *  *  *  "

Section 96 provides: "When one deals with a special agent or an agent who has only special authority to act for his principal, he acts at his peril, for he must acquaint himself with the strict extent of the agent's authority and deal with the agent accordingly. Such third person must inquire into the extent of the agent's authority; he is not justified in relying upon any appearance of authority except that which is directly deducible from the nature of the authority actually conferred. The reason for this is that if the power of an agent is special and limited, it must be strictly pursued and construed, with the result that neither the agent nor a third person dealing with him as such can claim that the agent had a power which they had not a right to understand was actually conferred."

The foregoing rules are firmly established in this jurisdiction. (*Barrett* v. *McHattie*, 102 Mont. 473, 59 Pac. (2d) 794; *Benema* v. *Union Central Life Ins. Co.*, 94 Mont. 138, 21 Pac. (2d) 69; *Moore* v. *Skyles*, 33 Mont. 135, 82 Pac. 799, 114 Am. St. Rep. 801, 3 L. R. A. (n. s.) 136.) In *Benema* v. *Union Central Life Ins. Co.*, supra, this court said: "A person dealing with a special agent must at his peril ascertain the extent of the authority of the agent." Sowter was a special agent of the defendant. (*Barrett* v. *McHattie*, supra.)

Phelps knew Sowter's power to act for the defendant was limited. Phelps testified that when he discussed the Triepke deal with Sowter, the latter told him that he, Sowter, could not

sell the Triepke land nor lease it; that he would have to take such matters up with the company, but he did have the author- ity to hire Phelps to do the plowing. This was sufficient to put Phelps on inquiry to determine the extent of Sowter's authority.

Having determined that the declarations of the deceased agent ██ Sowter as testified to by Phelps were inadmissible, this leaves the record without any competent evidence upon which the jury might find that the alleged contract was entered into by the authorized agent of the defendant. Ordinarily this would leave the record in such condition whereby we would be com- pelled to hold that the trial court was in error in denying the motions for nonsuit and directed verdict. However, on the trial of this case plaintiff offered to prove by the witness Stedman that the witness had dealings and negotiations with reference to plowing contracts with the agent Sowter, which he proceeded to perform and thereafter communicated with the defendant company, stating the fact that he had made such an agreement, and that on July 30, 1928, the company forwarded to him a check in partial settlement for the services, and that, upon in- vestigation of the work done, full settlement would be made. Plaintiff further offered to show by the same witness that sim- ilar transactions to this one were consummated with the defend- ant life insurance company through its agent Sowter during the years 1928, 1929, 1930 and 1931. The offer was by the trial court denied, for the reason that it was not shown that either of the members of the copartnership of Phelps & Son had any knowledge of these transactions. This ruling was error.

Apparently the trial court failed to recognize the distinction ██ between an ostensible and an implied agency. If the tes- timony was offered for the purpose of proving an ostensible agency, then knowledge of these transactions on the part of the plaintiff or his assignor would have been necessary. But in the case of an implied agency the fact that the offered evidence failed to disclose that plaintiff, at the time he dealt with the agent, knew of the acts of the principal creating the agency, or the circumstances showing the extent of the agent's authority,

is immaterial. (*Commercial Credit Co.* v. *Blair*, 84 Mont. 314, 275 Pac. 748.)

Plaintiff has made no cross-assignments of error, nor has he perfected a cross-appeal. The right to make cross-assignments of error is regulated by statute (sec. 9751, Rev. Codes) ; the scope and effect of this statute have been frequently considered by this court. It applies only to cases in which the respondent makes cross-assignments upon error or rulings adverse to him and preserved in the bill of exceptions, in order to enable this court to determine whether those complained of by appellant were compensated for or rendered harmless by reason of them. (*Hamilton Co.* v. *Battson*, 99 Mont. 583, 44 Pac. (2d) 1064, 101 A. L. R. 520, and cases cited.) If the offered evidence had been received and fully sustained the offer as made, we then might be able to say that the error in the admission of the testimony of Phelps might have been rendered harmless by the admission of other testimony. But, as the record stands, we have only the mere offer to prove, and cross-assignments of error would not have enabled us to say in this case that the errors in favor of plaintiff were compensated by the errors against him.

We recognize the rule that errors respecting matters not before the supreme court on appeal may only be presented on cross-appeal. (*In re Silver's Estate*, 98 Mont. 141, 38 Pac. (2d) 277 ; *Best* v. *London Guarantee & Accident Co.*, 100 Mont. 332, 47 Pac. (2d) 656.) However, the foregoing rule does not supersede one which we are about to mention where the record is in the condition as the one before us. Under section 8805, Revised Codes, this court may affirm, reverse or modify any judgment or order appealed from, and may direct the proper judgment or order to be entered, or direct a new trial or further proceedings to be had. We will ordinarily, when a judgment for plaintiff is reversed for error in refusing to direct a verdict for the defendant after the former has had a full opportunity to introduce all of his evidence, and it appears that the case is not supplemented by the defendant, order a judgment of dismissal. (*State ex rel. La France Copper Co.* v. *District Court*, 40 Mont. 206, 105 Pac. 721 ; *Doyle* v. *Union Bank & Trust Co.*, 102 Mont. 563, 588, 59

Pac. (2d) 1171.) But where, as here, the plaintiff had some additional testimony which the trial court erroneously declined to hear and which he was entitled to have received and considered, appropriate offer of proof being made, we will not order the case dismissed but will remand it for a new trial.

Since the judgment in this case must be reversed and the cause remanded for a new trial, the question as to the admissibility of statements alleged to have been made by the deceased agent Sowter to David V. Phelps is likely to arise again as it did on the first trial. The language contained in the exception under subdivision 4 of section 10535, Revised Codes, is identical with that found in subdivision 3 of the same section. This court has many times construed the meaning of this exception in subdivision 3. Since the language is the same, the rule should be the same. What we said in the case of *Pincus* v. *Davis,* 95 Mont. 375, 26 Pac. (2d) 986, with reference to the admissibility of evidence under subdivision 3 is likewise applicable here. It is as follows: ''The trial court should not admit the testimony of such a witness until sufficient other testimony has been admitted to warrant the court, in the exercise of its discretion, to render a ruling in favor of the questionable testimony. The court must exercise this discretion with caution and reasonable strictness, and not so loosely as to infringe on the general rule, unless it reasonably appears that otherwise injustice will result, and therefore the exception rather than the rule should apply. (*Wunderlich* v. *Holt,* 86 Mont. 260, 283 Pac. 423; *Langston* v. *Currie,* ante, p. 57 [95 Mont.], 26 Pac. (2d) 160.)'' The last cited case illustrates the application of the rule as to what constitutes a necessary foundation for the admission of this class of testimony.

It has been suggested that there was sufficient proof of other contracts of a similar nature entered into by the agent Sowter with third parties which the company recognized, to send the case to the jury on the question of implied agency. The witness Phelps testified, over objection, that he had knowledge of other contracts being entered into between Sowter and third parties of a similar nature. Such testimony, if offered for the

purpose of showing knowledge and as preliminary to further inquiry, might be permissible, but it has no probative force to establish the existence of such contracts. (*McKee Livestock Co.* v. *Menzel,* 70 Colo. 308, 201 Pac. 52; see, also, *First National Bank of Miles City* v. *Bullard,* 20 Mont. 118, 49 Pac. 658; *Baker* v. *Citizens' State Bank of St. Peter,* 81 Mont. 543, 264 Pac. 675.) The offer of such testimony as proof of a contract is obnoxious to the opinion rule. (Subd. 4, sec. 658, Wigmore on Evidence, 2d ed.; *Callahan* v. *Marshall,* 163 Cal. 552, 126 Pac. 358; *Gile & Co.* v. *Lasselle,* 89 Or. 107, 171 Pac. 741.)

For the reasons stated, the judgment is reversed and the cause remanded to the district court of Fergus county with instruction to grant the defendant a new trial.

ASSOCIATE JUSTICES STEWART, ANDERSON and MORRIS concurring.

MR. CHIEF JUSTICE SANDS, being absent on account of illness, takes no part in the foregoing opinion.

MR. JUSTICE ANGSTMAN:

I dissent. The majority opinion concedes the fact that an agent's authority need not be actual but may be ostensible (sec. 7947, Rev. Codes), or implied.

Here, before the declaration of Sowter to the effect that he had authority to hire Phelps to do the plowing was admitted, Phelps had testified: "Q. And did he [speaking of Mr. Sowter], to your knowledge make such contracts of employment with various people in Fergus county? A. Yes, sir." Moreover, there was proof here that the defendant had paid $30 on the contract in question, and hence there was some evidence of ratification. (Sec. 7941, Rev. Codes.) Thus, where the extent of the agent's authority is proved prima facie by other evidence, as here the declarations of the agent as to the extent of his authority are admissible in corroboration. (3 C. J. S., Agency, sec. 524, p. 287, note 97; 2 C. J. 939.) No such proof appeared in the case of *Benema* v. *Union Central Life Ins. Co.,* 94 Mont. 138, 21 Pac. (2d) 69, and in the other cases relied upon on this point in

the majority opinion, and therefore those cases are not in point here.

I agree that it was error to exclude plaintiff's offered testimony showing that Sowter had made similar contracts of employment with other named individuals. This, however, would simply corroborate the statement of Mr. Phelps that he knew that such contracts had been made.

In my opinion, this case does not call for a new trial simply to enable plaintiff, who has already prevailed, to make additional corroborative proof.

I think the statement of Phelps that he knew that Sowter had made similar contracts of employment with various people in Fergus county was sufficient to show implied agency and to render admissible Sowter's statement that he did have such authority.

The cases of *McKee Livestock Co.* v. *Menzel,* 70 Colo. 308, 201 Pac. 52, *First Nat. Bank of Miles City* v. *Bullard,* 20 Mont. 118, 49 Pac. 658, and *Baker* v. *Citizens' State Bank of St. Peter,* 81 Mont. 543, 264 Pac. 675, are not in point here, for in those cases the proof simply went to show that the witness "understood" or "entertained the opinion" that the agent had the necessary authority. Here the proof was positive that Sowter had actually made similar contracts with others to the knowledge of Phelps. I furthermore think the court properly exercised its discretion under subdivision 4 of section 10535, Revised Codes, in admitting the declaration of Sowter.

I think that, so far as defendant is concerned, the case was fairly tried and that the judgment should be affirmed.

Rehearing denied September 22, 1937, MR. JUSTICE ANGSTMAN, dissenting.

MR. CHIEF JUSTICE SANDS, Dissenting from Order Denying Petition for Rehearing:

The majority base their decision squarely on the point of agency and Sowter's power to make the alleged contract, and can be analyzed as follows:

The court decided that the only evidence of the contract and the power were the statements of the deceased agent, Sowter, made to David Phelps, and that such statements were inadmissible on the grounds that statements of an agent are not admissible against the principal to prove the power and authority of the agent on the scope or extent thereof, unless such acts or declarations were done or made in the presence of the principal or with his knowledge, or were authorized or ratified by him, or there was other evidence of authority. This lack of evidence, the court decided, would ordinarily justify a nonsuit or directed verdict.

There was excluded by the trial court certain evidence which if admitted might prove an ostensible agency, and thus sustain plaintiff's right to recover; therefore the court holds a retrial is necessary.

I have no quarrel with the stated rules of law depended upon by the court in reaching its decision. I contend, however, that the majority decision overlooked certain qualifications to the rules and certain evidence in the transcript which, if applied together, will render a retrial unnecessary and enable the court to sustain the verdict for the plaintiff, especially when it appears that the case has been tried twice already and in both trials there was a unanimous verdict for the plaintiff. Judge Ford, a veteran trial lawyer, denied a new trial on the very record before us. Counting his vote with the dissenters in this court, it is a tie, with the verdict of two judges in his favor.

The general rule as cited by the court on page one of the decision declares that statements of the alleged agent are inadmissible "unless such acts or declarations were done or made in the presence of the principal or were within his knowledge, or were authorized or ratified by him, or there is other evidence of authority." This qualification is otherwise stated in the following sections of 2 C. J. 939. Section 695: "While the declarations of an alleged agent are of themselves incompetent to prove agency, if the agency is otherwise prima facie proved they become admissible in corroboration, where they constitute a part

of the *res gestae* and were made at the time of the transaction in question."

The qualification is universally recognized in American jurisprudence, and I need not cite all of the multitudinous decisions in support of it. I cite two of the latest of many decisions: *Dooley* v. *West American Com. Ins. Co.,* 133 Cal. App. 58, 23 Pac. (2d) 766; *Commercial Standard Ins. Co.* v. *Rinn,* 100 Colo. 76, 65 Pac. (2d) 705 (1937). In the Colorado case, at page 707, the court says: "Such evidence is proper when prima facie proof of agency has been made, and that, in so far as it was here wanting at the time this testimony was admitted, it was later forthcoming and the error, if any, was cured." This last clause failed to receive consideration in the majority opinion. The above doctrine is clearly applicable in this case.

I believe the court in the majority opinion overlooked some very pertinent testimony respecting the authority of the agent, Sowter, introduced both by the plaintiff and the defendant, particularly that of the defendant. It was brought out, and never denied, that Sowter was agent of the defendant company. The testimony of the defendant's witness B. H. Smith indicates this; specifically where he testifies as to the authority of Sowter: "and, in general, to look after the interests of the company in his particular district." It appeared by uncontroverted testimony that Sowter had worked for the company for about fifteen years, and that he continued to work for it up to the day of his death. There was testimony by David Phelps that he had previously contracted for work of the same character with Sowter, and had been paid therefor by the company; also that he had personal knowledge of other such contracts made by Sowter with other members of the community. This uncontradicted testimony clearly indicated that Sowter had previously had such authority as is here contended for to the undisputed knowledge of the company. Further, there was proof that defendant had paid $30 on the contract in question to plaintiff, and no testimony was offered to the contrary.

Here, then, is strong prima facie evidence of the authority in question, and, standing alone uncontradicted, would be suffi-

cient to justify a finding in favor of the plaintiff, and corroborated. The statements of the agent, therefore, are evidence as to the extent of the agent's authority.

The majority opinion ignores section 10535, Revised Codes of 1935, and totally fails to apply the all-important last phrase of both subsections 3 and 4: "except when it appears to the court that without the testimony of the witness injustice will be done." In *Anderson* v. *Wirkman*, 67 Mont. 176, 215 Pac. 224, the court admitted the testimony of the plaintiff, she being the only surviving witness, it appearing that without her testimony an injustice might be done. The case of *Wunderlich* v. *Holt*, 86 Mont. 260, 283 Pac. 423, decided that the matter rested in the sound discretion of the trial court: "It becomes apparent that it is lodged in the sound discretion of the court to determine in each case as it develops, during the trial, whether the testimony is necessary to enable the plaintiff to make a prima facie case and thus prevent an injustice." Thus, if, as the court contends, these statements are the only evidence available, they would be clearly admissible if the trial court found, as it did, it certainly must have found that the testimony should be allowed in order to do justice in the case. (*Pincus* v. *Davis*, 95 Mont. 375, 26 Pac. (2d) 986.)

Sowter, the agent, is dead. David Phelps is the only other party who was present when the alleged contract was made who knew of his own knowledge what statements were made at that time. The cases cited by the court in support of its conclusion that the testimony of Sowter was inadmissible, he being dead, do not hold that the discretion of the trial court supported by competent evidence can be set aside.

Clearly, these statements of defendant's own witness are competent and convincing evidence sufficient to sustain the court's holding that Sowter's statements to Phelps as to his authority to negotiate the contract for the company were authorized. Without them, the only chance of definitely establishing the contract might be lost, and the plaintiff would be left to the mercy of his opponent. The defendant company would have the benefit of his labors over a long period of time without pay-

ing for them. Can it be reasonably said that the trial court here exercised its discretion so loosely as to infringe the general rule?

The court in its opinion indicates that the agent's authority might be ostensible. It is the opinion of the dissenting members that the court is mistaken in distinguishing between an ostensible and implied agency in this connection. The Codes of this state recognize no distinction; they invariably use the term "ostensible" whenever any other than an actual agency is intended. Section 7931 declares: "An agency is either actual or ostensible." The case relied upon by the court, *Commercial Credit Co.* v. *Blair,* 84 Mont. 314, 275 Pac. 748, draws no such distinction, but does in fact find an agency indicated by surrounding circumstances comparable in many respects to the facts and circumstances in the present action. "Ostensible authority depends upon the acts or declarations of the principal and not upon the acts or declarations of the agent." (1 Cal. Jur., p. 741.)

When an agent is placed by his principal in charge of the business in a certain locality it is a general rule that he is clothed with apparent authority to do all things that are essential to the ordinary conduct of the business at that place. Sowter had previously, on behalf of the company, entered into contracts for plowing land. Sowter had authority—indeed he was expressly directed—to negotiate the sale of this particular land and submit his negotiations to the Billings office, but with the express understanding that any proposed contract for the leasing or sale was necessarily subject to approval by the company, then the Billings office, and to deal with it, up to the point of lease or sale, apparently as he saw fit. The fact that the defendant company knew that the plaintiff and his father were working the land and putting it into cultivation and encouraged them in their efforts, is enough to establish a contract of some kind entered into by Sowter.

Phelps was the only living witness that could testify as to the making of such contract. The telegram introduced by the company, directing Phelps to take charge of the livestock at

once, showed that it recognized Sowter as its agent. Consider the testimony of B. H. Smith a witness for defendant: "It is my recollection we were to pay him the full amount of the plowing payments in cash and add it to the purchase price." Is it not evident that the company conducted itself in such a manner that David Phelps was justified in relying on this ostensible authority of Sowter to hire him?

Section 7947, Revised Codes, provides: "Ostensible authority is such as a principal intentionally or by want of ordinary care causes or allows a third person to believe the agent to possess." The California Civil Code, section 2317, is identical with our section 7947, and is thus construed in 1 Cal. Jur., p. 737: "This is the embodiment of a well-established principle of the common law which has been called the foundation of the law of agency. By this rule it may be said that an ostensible agency exists where the business done by the supposed agent, so far as open to the observation of third parties, is consistent with the existence of an agency, and where, as to the transaction in question, a party dealt with was justified in believing that an agency existed. The doctrine of ostensible agency, while apparently distinguishable from strict authority by estoppel, unquestionably draws its support from the equitable principles of estoppel in pais, and stands as a shield against the working of an unjust injury to third persons."

Section 7961, Revised Codes, declares: "A principal is bound by the acts of his agent under merely ostensible authority to those persons only who have in good faith and without ordinary negligence, incurred a liability, or parted with value upon the faith thereof." The evidence in this action unquestionably warrants a finding of an ostensible agency and authority under the above statutes, and that the defendant is bound thereby. (*Smeade* v. *Rosen*, 121 Cal. App. 79, 8 Pac. (2d) 507.) Obviously nothing can be accomplished by ordering a new trial to enable the plaintiff, who has already twice prevailed in the court below (two juries having found in his favor) to enter more proof and corroborative evidence.

The case was submitted to the jury under proper instructions and they found for the plaintiff. The jury is the trier of facts, and under our jury system their findings are conclusive upon the subject. In no case has the evidence ever been declared insufficient to support the verdict unless the physical facts shown to exist demonstrated the impossibility of such evidence being true, or unless the evidence and circumstances themselves were so conflicting and so highly improbable as to be impossible of belief. (*McGonigle* v. *Prudential Ins. Co.,* 100 Mont. 203, 46 Pac. (2d) 687; *Wallace* v. *Wallace,* 85 Mont. 492, 279 Pac. 374, 66 A. L. R. 587; *Boyd* v. *Great Northern Ry. Co.,* 84 Mont. 84, 274 Pac. 293.)

In *Bell* v. *Grimstad,* 82 Mont. 185, 266 Pac. 394, this court said: "From all the evidence, the question of whether payment for the sheep and Liberty Bonds had been made by Grimstad to the bank or to Craig, and whether Craig or the bank acted as the plaintiff's agent in receiving payment, was in our opinion a question for the jury. The rule is firmly established by a long list of decisions by this court that the jury is the trier of facts, and that no case will be taken from its consideration where the evidence is in conflict as to the material facts. The oft-repeated doctrine enunciated is that a case will not be taken from the jury on a motion for a directed verdict when, from the the evidence, reasonable men may draw different conclusions. (*Nord* v. *Boston & Mont. Con. C. & S. Min. Co.,* 30 Mont. 48, 75 Pac. 681; *In re Carroll's Estate,* 59 Mont. 403, 196 Pac. 996; *Pratt* v. *Kistler,* 72 Mont. 356, 233 Pac. 600; *Puutio* v. *Roman,* 76 Mont. 105, 245 Pac. 523; *Dunn* v. *Beck,* 80 Mont. 414, 260 Pac. 1047.)''

There is obviously no such inconsistency between the circumstances and the evidence in this case as to justify removing it from the jury. The evidence was sufficient and two competent juries so found, to indicate Sowter's authority and defendant's liability for the work done. The error in excluding plaintiff's corroborative evidence is not fatal or injurious to the right of either party and does not, therefore, justify a retrial of the action.

212

The majority opinion holds that a determination of the controversy depends upon whether Sowter, as the agent of the defendant, had the power to make the alleged contract for the plowing. In resolving this question consideration was not given to a rule of law which in my opinion is decisive of the matter.

The transcript indicates that throughout the trial the defendant had never denied the making of the contract with plaintiff's assignor. It repeatedly introduced evidence of and referred to a contract which it alleged was the real contract involved herein. By such showing and such allegations it effectually admits the authority of its agent to make some kind of a contract. The only contested issue is the kind of a contract made. The doctrine is well stated in 2 C. J. 913, section 627: "In an action on a contract the authority of the agent to make the contract is admitted where the answer admits the making of a contract but avers that it was upon a different compensation from that alleged in the complaint, or where the answer admits the contract but alleged terms materially different from the contract set out in the complaint." This doctrine has been adopted by this court in *Miller* v. *Yellowstone Irr. Dist.*, 91 Mont. 538, 9 Pac. (2d) 795, where the proof showed employment, though a different contract was claimed by defendant. (See, also, *Hamil* v. *Baumhover,* 110 Iowa, 369, 81 N. W. 600.) It is believed that the allegations and evidence advanced in this action come substantially within this rule and that it is decisive of the question.

I quote several important and all-controlling portions of the testimony of David V. Phelps, to show conclusively the injustice of ordering a third trial of this case: "Sowter said he wanted us to take and break that ground up, go over there and take charge of the Triepke place and take charge of the stock and machinery, and bring it all over from Triepke's, and wanted us to break this ground and get it in a state of cultivation. As to whether he said anything about making a deal to sell me the Triepke land, not at that time; later on there was a deal talked of about selling the Triepke land. I expect it was a month afterwards, about the middle of May. After Mr. Sowter and I talked, about

the first of April, the next thing that happened after this conversation I went over after machinery. I can't say the date.'' Defendant's Exhibit No. 2 on cross-examination was then offered and admitted in evidence over the objection of the plaintiff, which reads as follows: '' 'Billings, Montana, April 11, 1930. David V. Phelps, Winifred, Montana. This telegram is your authority to take over all the Fred Triepke equipment which company purchased in connection with the Brunckhorst-Fowler sale, the land and equipment to be sold to yourself and son at same base price as Triepke contract, with any additional payments for plowing and fence building repairs added. H. B. Smith.' * * * Sowter was out every few days. After the telegram came I went over to the Triepke place to get the equipment and move it over to the home place. * * * 'We are making the sale contracts and sending them to Mr. Sowter, who will come to Winifred within the next two or three days to have them executed. I thought it advisable to send the cropping plan to you in advance, so that you can be going ahead with your spring seeding. I understand, however, that you have already put some of the fields in shape for seeding and possibly have seeded some of the wheat by this time. Please acknowledge receipt, and advise us whether the cropping plan meets with your approval. Yours very truly, H. B. Smith.' * * * Why, sometime I would take it up with Sowter and sometimes I would call up over the phone, and again I would write. Just anyway that was convenient, that was what I was to do. * * * I testified the only money paid for work in plowing, breaking and rebreaking the Triepke place was $30 to Herbert. I had other land which I myself had personally bought from the defendant, and that was about five or six miles from the Triepke land. As to my personal affairs, the Union Central Life Insurance Company took the crop. When the cattle were sold, the insurance company got all the proceeds. And when the hogs were sold the insurance company got the proceeds, and when I got money to buy seed and feed for the home place I got it from the defendant. From time to time they would advance money received for the crop for things needed on the place and all the

money which I received from the defendant which was sent to me for these men, except a $30 Herbert got, was charged to me. In 1932, I think it was that I made a settlement with the Union Central Life Insurance Company on my own personal affairs. At that time the company figures up the amount of money and after they had found the balance due I gave them a note. * * * Later on we had some talks with Sowter with reference to purchasing, but never came to any decision about it. Sowter sent me the old Triepke contract. * * * He said we would go ahead, and in the event the sale went through that Phelps & Son could apply part of their earnings off this plowing on to the sale contract.'' On cross-examination the witness stated: ''We talked about it. Mr. Sowter told me at that time that he didn't have any authority to enter into a contract to sell me the Triepke land—that that would have to be taken up with the company, but he did tell me that he had authority to hire me to plow, to break this land.

''Q. I am asking you if you did not on this witness-stand state a few moments ago that Mr. Sowter told you that he had authority to hire you to plow the land, to seed it, and to put it in crop?

''Mr. Baker: Just a minute, if the Court please, I object to the question on the ground it has already been answered.

''The Court: The objection is sustained. He said he did.''

But the testimony of defendant's witness, Smith, leaves no question of doubt about Sowter's authority: ''My name is Bennett H. Smith. * * * From the fall of 1924 until September 30, 1934, I had a connection or position with the defendant company. Its headquarters and general office is at Cincinnati, Ohio. I was employed as assistant manager of the Montana district located at Billings. * * * My authority to represent the defendant was not in writing. We had charge of property investments of the defendant company in Montana and northern Wyoming. We had no authority to close the transaction. We had no authority to sign the company's name to any contracts or agreements, or to make any contracts in their behalf that were not signed by and approved by them, that is, as

to the disposition of their lands, whether by lease or sale. I knew H. B. Sowter during the years 1929, 1930, 1931 and 1932. As to what, if any, official position he held with the company, we called him a field man. * * * Mr. Sowter was employed under the general office and worked under our instructions. I know what instructions were given him or what authority he had under our instructions in connection with the lands that we looked after. His instructions and authority were as general field representative to keep in contact with the various properties in this particular district and endeavor to find tenants and purchasers, and to contact delinquent borrowers, and in general to look after the interests of the company in his particular district. * * * As to leases, he could not complete leases. He could negotiate it. * * * Sowter had worked for the company through our office, I should say about fifteen years before his death. * * * I got in touch with Mr. Sowter and told him that it was our idea that Phelps, that is David V. Phelps, could handle this property and take over the equipment and livestock to good advantage in connection with the deal on the home place, and suggested he see Mr. Phelps and see if he could work it out for him to take over the place under the crop payment plan contract, the same as he had on the home place, and outlined to him how he would handle the livestock and equipment, calling his attention to the fact that on the equipment there was a balance due to the equipment companies from whom the equipment had been purchased, the company only having made the down payment on it for Mr. Triepke, and that there was certain livestock, twenty or twenty-three head of livestock, which we would turn over to Mr. Triepke in the transaction—I said Triepke, I mean Phelps—in the transaction, and take a mortgage for the value, which we figured was $1,000.

''Q. So then, what, if anything, did Mr. Sowter do so far as you personally know? A. *Mr. Sowter reported that he had seen Mr. Phelps and presented the proposition to him,* and that it was satisfactory; that he would take over the Triepke land under the same contract at the same price Triepke had it, and

would take over the livestock and equipment and go to work on the place.

"Q. Now, after Mr. Sowter communicated that to you, what, if anything, did you or your office at Billings do? Did you have any— A. I sent a telegram to Mr. Phelps, * * * *the thing of first importance being to get spring work under way immediately.* * * * From the spring of 1929 until the spring of 1932 there was a great deal of correspondence between the Billings office and David V. Phelps, consisting generally of letters from Mr. Phelps, letters from our office to him, telegrams, conversations and reports from Mr. Sowter. * * * I told Mr. Phelps we had been working over the various reports on the acreage submitted by Mr. Sowter and had arrived at the conclusion that there were 465 acres of what we call old land and rebreaking, for which he would receive two dollars an acre under the proposed contract, and that there were 175 acres according to our records of sod on which he would receive four dollars per acre."

On cross-examination of the witness Bennett H. Smith, he testified: "I have heretofore testified that I had no knowledge and our records show nothing in connection with any contract that Mr. Phelps states was made with Mr. Sowter. As to the usual course of business, any time Mr. Phelps needed anything in connection with his farming operations he would take it up with the Billings office either by letter, by telephone, or *through Mr. Sowter* for approval of the Billings office, and at the Billings office, if it was within the approval under which we operated from the company in connection with the particular deal, we would approve it and authorize the purchase. * * * Along about 1930 the company had in the neighborhood of 500 farms in Montana. The company maintained and paid the office expenses at Billings. As to whether or not *the company authorized us to make any oral or verbal sales of real estate,* we were not authorized to make verbal *sales* of real estate, and any time we contemplated selling a piece of real estate it was necessary to submit that to the head office in Cincinnati for their approval, and when the contract was finally entered into we drew

the contract and submitted it to the head office for their approval or disapproval. * * * *The contract for the Triepke land between the company and Mr. Phelps was never made up.''*

The witness being recalled, he testified: ''With reference to the discussions over the telephone with David V. Phelps with reference to a contract to purchase the Triepke land and take over the personal property, *that contract was never reduced to writing in the contract form.* There were a great many reasons why. *One was that we just never got around to it in the year 1930. Had a great many of those deals on and they just dragged along and never got around to making up the contract* * * *

''Q. It likewise provided, did it not, for certain things to be done by Mr. Phelps? A. It did.

''Q. Were those things done? A. *In part.*

''Q. The contract as discussed,—the proposed contract as discussed,—provided for payments to be made by Mr. Phelps, did it? A. It did.

''Q. Were they made? A. They were not.

''Q. Now, Mr. Smith, you stated a few moments ago this morning that the advancements discussed between you and Mr. Phelps over the phone for the plowing, or for the breaking and rebreaking under the contract that you had discussed that was to be made, that those advancements had been made by the company? I believe you stated that yesterday? A. I did.

''Q. How were they made, Mr. Smith? A. By draft drawn by the Billings office on the company at Cincinnati.

''Q. And those were paid under your supervision and direction? A. They were. They were drawn—they were paid at Cincinnati. They were drawn under our supervision * * *
*It was the understanding that our office was to draw the contract and submit it to Mr. Phelps and the Home Office. It was all approved. It was just a detail that we didn't get around to.''*

The testimony shows conclusively that the deceased agent, Sowter, did have authority to negotiate for the plowing. If the defendant did not know accurately what the contract was, the company permitted Phelps to plow up the land upon the understanding that he was to be paid for it. If there was to be a

contract to buy the land, defendant was to blame for failure to complete that sale. I have copied more of the testimony than usual. because the decision of the majority seems unusually unjust.

In conclusion let it be understood that, in my opinion, the trial court did not abuse the discretion expressly lodged in it by statute permitting in the record the testimony of Phelps as to the authority of the deceased witness Sowter.